**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ANDREW H.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 24 C 3053** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **MARTIN J. O'MALLEY,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits and Supplemental Security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§416(I), 423, 1381a, 1382c, over three years ago in January of 2021, alleging he became disabled on August 1, 2014, which he later amended to December 8, 2017. (Administrative Record (R.) 49, 75, 84).[2] He claimed that he had been disabled due to "Bipolar, Memory Loss." (R. 293, 360). Over the next three years, plaintiff's application was denied at the initial and reconsideration levels, but granted in part at the administrative law judge (ALJ), and appeals council levels. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§ 404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on April 16, 2024, and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) on April 24, 2024. (R. 12). Plaintiff asks the court to reverse and remand the

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

[2] Plaintiff had previously applied in March and October of August 2020, was denied as of December 7, 2017. (Administrative Record (R.) 49). As such, he had to amend his alleged onset date.

Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairment: coronary artery disease. (R. 20). As for the plaintiff's hypertension; hyperlipidemia; status-post cerebrovascular accident (CVA); pulmonary nodules; thoracic spine degenerative spondylosis; migraine headaches; and gastroesophageal reflux disease (GERD), the ALJ determined that those impairments were not severe as they no more than minimally affected the plaintiff's ability to perform basic work-related functions. (R. 20). The found that there was no medical evidence pertaining to any seizure disorder and concluded that this was a non-medically determinable impairment. (R. 20). The ALJ also found that the plaintiff's bipolar disorder, anxiety disorder, alcohol abuse disorder, in reported remission, and alcohol-induced mood, considered singly and in combination, did not cause more than minimal limitation in the plaintiff's ability to perform basic mental work activities and were, therefore, nonsevere. (R. 21-24). More specifically, the ALJ found that those mental impairments caused no more than a mild limitation in the areas of understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; managing oneself. (R. 24-26). The ALJ determined that the plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, paying particular attention to Listing 4.04. (R. 26-27).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to capacity to perform medium work with the following exceptions: "no climbing ladders, ropes, or

scaffolds; no work around unprotected heights or unprotected dangerous moving machinery; no concentrated exposure to dust, fumes, or poor ventilation." (R. 27). The ALJ then summarized the plaintiff's complaints. She noted that plaintiff testified that, due to his cardiac impairment, he tired easily, and had dizziness and lightheadedness. He testified that he could walk two blocks or stand for five minutes before becoming dizzy. He alleged that he easily lost his. He claimed that these symptoms began in 2014. He also claimed that, due to his mental impairments, he did not like to be around people because he becomes nervous, and he "snaps" when triggered. He stated that he tried to work construction for a year, "maybe an hour here or an hour there," but he was ultimately unable to get along with people. (R. 27). The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 28). The ALJ then explained that her finding of a reduced range of medium work was "supported by the evidence showing that the objective findings in the medical evidence of record, as well as documented statements by the claimant to treatment providers, fail to corroborate his alleged disabling limitations." (R. 28). The ALJ noted that, while the plaintiff alleged he became disabled in December 2017, there was little in the way of medical evidence regarding any physical issues until February of 2021. (R. 28). There was a psychiatry visit in March 2019, at which plaintiff said he was retired, but worked "here and there in construction to make some money." (R. 28). Yet, the ALJ pointed out, at his hearing, the plaintiff testified he had not done any such work for ten years. Then he said he had not done any in four years, but could not continue because he did not get along with the people. (R. 28). In any event, the plaintiff's physical exams

3

were normal, and he had no complaints from February 2021 to December 2022, when he said he had lost twenty pounds due to donating blood plasma twice a week. (R. 28). Other than that, plaintiff's physical exam was normal, and he was counseled to quit smoking. (R. 29).

In January 2023, due to his smoking, the plaintiff had a chest CT scan that showed a noncalcified pulmonary nodule in the right lower lung, severe coronary artery calcifications, and what appeared to be a thoracic aortic aneurysm. (R. 29). Exam showed decreased breath sounds, and he was again advised to quit smoking. (R. 29). Plaintiff denied chest pain, palpitations, dizziness, or syncope, PND or orthopnea and leg edema. He said he was a smoker and admitted to dyspnea on exertion. Cardiac exam was essentially normal: regular rate and rhythm, normal heart sounds, without murmur, and non-displaced point of maximum impulse, pulses were intact. (R. 29).

Due to an abnormal EKG with dyspnea on exertion a stress test was conducted in February 2023. The cardiac echocardiogram showed normal left ventricular ejection (LVEF), normal right ventricular systolic function, no pericardial effusion and mild mitral regurgitation. A myocardial perfusion study showed no evidence of ischemia, normal ejection fraction, a normal EKG, and suggested moderate fixed coronary artery disease, predominantly regarding the right coronary artery. A February 2023 chest CT scan showed no aneurysm in the thoracic aorta. A treadmill exercise stress test was switched to a Lexiscan due plaintiff complaining of fatigue on the treadmill. The test showed no ischemia, a normal ejection fraction, and the EKG was normal. (R. 29).

At a February 2023 cardiology follow-up plaintiff complained of shortness of breath on exertion, but denied any chest pain, tightness, heaviness, pressure, dizziness or syncope. A March 2023 heart catheterization showed non-obstructive coronary artery disease, at most a 40% mid-left anterior descending artery (LAD), and 40% obtuse marginal artery #2 stenosis. Treatment with

medication was recommended. A March 2023 EKG further confirmed normal sinus rhythm, left axis deviation, right bundle branch block, but the L anterior fascicular block noted on prior EKG was no longer present. (R. 29). At a March 2023 cardiology follow-up, the claimant reported "feeling fine," and denied chest pain or shortness of breath, and had no other complaints. Physical examination was within normal limits. The ALJ commented that there were no limitations placed on plaintiff's activities at any of his cardiology sessions. (R. 30).

The ALJ revisited the plaintiff's allegations and compared them to the medical record, noting some inconsistencies. At his hearing, the plaintiff said he last did construction work ten years prior, but told his doctor he did some in 2019. He quit because he didn't get along with the people. He was the primary caregiver for his elderly mother, helping her up and down stairs. (R. 30). The ALJ further noted that the plaintiff did not reported his severe dizziness – after just fifteen minutes of standing – to his doctors, although he claimed he did. (R. 31).

The ALJ then relied on the testimony of the vocational expert to find that the plaintiff was unable to perform his past relevant work as an overhead crane operator. (R. 33-34). The ALJ further relied on the vocational expert's testimony to find that there were other jobs in the national economy that the plaintiff could perform, including linen room attendant (DOT #222.387-014, approximately 54,000 jobs nationally); laundry worker (DOT #361.684-014, approximately 50,000 jobs nationally); box bender (DOT #641.687-010, approximately 20,000). (R. 34-35). Accordingly, the ALJ found the plaintiff not disabled and not entitled to benefits under the Act. (R. 36).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by substantial evidence, the court

5

on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). The substantial evidence standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Tutwiler v. Kijakazi*, 87 F.4th 853, 857 (7th Cir. 2023). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Security*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build a "logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v.*

*Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin,* 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir. 2011). While this requirement has been described as "lax", *Crowell,* 72 F.4th at 816; *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008), the Seventh Circuit has also explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski,* 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo,* 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert,* 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer,* 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep

water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might

see a trickle of a creek they can hop across with barely a splash. Indeed, the Seventh Circuit's

opinion in *Jarnutowski*, 48 F.4th 769, exemplifies this subjectivity. Two judges on that panel felt

the ALJ had not adequately explained aspects of her reasoning while a third judge, dissenting,

thought she did, as did the Magistrate Judge who had reviewed the ALJ's decision (by consent) at

the district court level. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1,

2021).

Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase

"minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v.

Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an

ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of

disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court

"emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and

evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the

evidence...in cases in which considerable evidence is presented to counter the agency's position."

*Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court

explained that the ALJ had to:

> explain why he rejects uncontradicted evidence. One inference from a silent opinion
> is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant.
> That is the reason the ALJ must mention and discuss, however briefly,
> uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287.

More recently, the Seventh Circuit has again emphasized that all ALJs really need to do is

"minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022);
*Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). The court has explained "that social-security
adjudicators are subject to only the most minimal of articulation requirements." *Warnell*, 97 F.4th
at 1053; *see also Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. May 31, 2024)(". . . ALJs are
'subject to only the most minimal of articulation requirements'—an obligation that extends no
further than grounding a decision in substantial evidence."). So, as ever, "[i]f a sketchy opinion
assures us that the ALJ considered the important evidence, and the opinion enables us to trace the
path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88
(7th Cir. 1985). In this instance, the ALJ did enough in regard to nearly all of the record with the
exception of the medical evidence from 2023.

### III.

The plaintiff makes a number of short arguments in support of reversing the ALJ's decision,
all of which are categorized into two main contentions. One main contention is that the ALJ's
residual functional capacity finding violated SSR 96-8p and was not supported by substantial
evidence. The other main contention is that the ALJ's evaluation of plaintiff's symptoms violated
SSR 16-3p and was not supported by substantial evidence. Any other arguments the plaintiff might
have raised are, of course, deemed waived. *Milhem v. Kijakazi*, 52 F.4th 688, 693 (7th Cir. 2022);
*Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.
2000).

### A.

We begin with a question regarding the stance the plaintiff seems to have taken in his brief
as to when his alleged disability began. When the plaintiff applied for benefits, he claimed he had

become disabled in August 2014. At his March 2023 hearing, he was forced to amend that alleged onset date to December 8, 2017, due to the fact that his previous application for disability benefits had been denied on December 7, 2017. (R. 48-49). He had not challenged that determination and so, it was *res judicata*. *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998). That being said, it is surprising that plaintiff continues to argue that he was disabled as of that amended date. [Dkt. #18, at 2, 14]. Especially as he concedes in his brief that his "cardiac impairment of coronary heart disease developed several years later in early 2023", that his "cardiac complaints and symptoms . . . began in early 2023" [Dkt. #18, at 10, 14], and his cardiac symptoms are the only basis he asserts for being disabled.

The burden is on the plaintiff to prove he is disabled by producing medical evidence. *Durham v. Kijakazi*, 53 F.4th 1089, 1096 (7th Cir. 2022); *Gedatus*, 994 F.3d at 905; *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010); 42 U.S.C. § 423(d)(5)(A)("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability...."); 20 C.F.R. §§ 404.1529(a); 416.929(a); *Gedatus*, 994 F.3d at 905 (7th Cir. 2021); *Karr,* 989 F.3d at 513 (7th Cir. 2021)(plaintiff must "identify[ ] . . . objective evidence in the record" that she is disabled); *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010). The only evidence the plaintiff mentions in his brief comes from *five years after* he claims he became disabled, and *three years after* his insured status expired. [Dkt. #18, at 2-3, 7, 8-9, 11]. *See Karr,* 989 F.3d at 513 (7th Cir. 2021)(plaintiff must "identify[ ] ... objective evidence in the record" that she is disabled); Supplemental Rules for Social Security Actions Under § 405(g), Rule 5 ("A brief must support assertions of fact by citations to particular parts of the record.").

Moreover, the plaintiff takes no issue with the ALJ's description of the medical record prior

to 2023 as including, in the main, normal examination findings and plaintiff denying any issues. That's understandable, because the ALJ's sense of the record was rather accurate. There is little or no medical evidence regarding the plaintiff's physical condition prior to 2023. There is certainly no medical evidence to suggest he was disabled due to anything prior to the expiration of his insured status on December 31, 2019. (R. 18, 74, 102). Beginning in April 2016, when he began some court-ordered treatment after two DUIs – his physical exam – gait, muscle tone, strength – were normal and he was cleared for participation in an exercise program. (R. 683). Plaintiff said he was depressed, but his psychological exam was normal other than that: recent and remote memory were intact, attention and concentration were normal, he was able to perform serial 7s; thought process, fund of knowledge and judgement were all normal. (R. 683).

While plaintiff's mood fluctuated thereafter – depressed, or irritable, or better, or good – his psychological exams were consistently normal on May 28, 2016 (R. 678-79), August 18, 2016 (R. 674), November 5, 2016 (R. 671), February 25, 2017 (R. 667), April 29, 2017 (R. 663-664), July 22, 2017 (R. 659-60), December 2017 (R. 655-56), March 8, 2018 (R. 651), May 26, 2018 (R. 647), and March 2, 2019 (R. 643). It appears to have been about that time that plaintiff went to jail on a charge of domestic violence against his sister. (R. 410, 637). At his first check-up after that on February 5, 2021, – he denied depression and denied any physical issues (R. 416-17). Physical exam normal and his mood and affect were appropriate. (R. 418). He tested negative for alcohol abuse but his cholesterol was elevated. (R. 419, 421, 422).

So, it is not clear why, despite that evidence, the plaintiff has taken the stance he has taken here in federal court. Simply put, the plaintiff has failed to prove he was disabled as of December 8, 2017, or before his insured status expired on December 31, 2019. (R. 18, 74, 102). That much of

11

the ALJ's decision is clearly supported by substantial evidence, and the plaintiff is not entitled to Disability Insurance Benefits. *See, e.g., Martin v. Kijakazi*, 88 F.4th 726, 727 (7th Cir. 2023); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005). As such, this case is only about whether the plaintiff is entitled to SSI due to his cardiac condition, which is something the plaintiff ought to have conceded in his brief.

### B.

It is also a bit surprising that the plaintiff makes the ALJ's evaluation of his subjective symptoms an issue. The term "credibility" has fallen out of favor, *see Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016), but what courts once said about an ALJ's credibility finding remains true about an ALJ's evaluation of subjective complaints: the court will overturn it only if it is "patently wrong, which means that the decision lacks any explanation or support." *Hess v. O'Malley*, 92 F.4th 671, 679 (7th Cir. 2024); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). The plaintiff's "flyspecking" of the ALJ evaluation of his allegations – picking at a sentence here and a sentence there in the ALJ's twenty-page decision – is insufficient to demonstrate the ALJ was "patently wrong." *See Warnell*, 97 F.4th at 1053 (7th Cir. 2024). Especially in a case like this where the plaintiff's testimony left much to be desired.

Plaintiff's first complains that the ALJ said there was no evidence of any cardiology-imposed limitations on the plaintiff's activities. [Dkt. #18, at 13]. That, of course, is true. None of the reports from plaintiff's cardiologists mentioned or set any limits on the plaintiff's activities and plaintiff certainly does not direct the court to any in his brief. *See Gedatus*, 994 F.3d at 902 (plaintiff "did not offer any opinion from h[is] doctors that h[is impairment] disabled h[im]."). Instead, the plaintiff points to his allegations at his administrative hearing. [Dkt. #18, at 13]. The plaintiff's confusion

seems to be over the difference between a doctor saying the plaintiff can't or ought not do something, and the plaintiff alleging he can't. The former is medical evidence, the latter is not. *See Karr*, 989 F.3d at 513 (plaintiff must "identify[ ] ... objective evidence in the record" that she is disabled); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)( "... [S]ubjective complaints are the opposite of objective medical evidence ...." ); *Zoch*, 981 F.3d at 601 ("A claimant's assertions of pain, taken alone, are not conclusive of a disability."); 42 U.S.C. § 423(d)(5)(A)("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability ....").

Next, the plaintiff complains that the ALJ said he "reported only 'dyspnea on effort.'" [Dkt. #18, at 13]. It's unclear what the plaintiff is getting at here, as the ALJ mentioned that one complaint after citing a laundry list of other symptoms – chest pain, palpitations, dizziness, syncope, leg edema, PND or orthopnea – the plaintiff denied experiencing. (R. 31). The ALJ did not, as the plaintiff seems to suggest, somehow base her finding that plaintiff could perform medium work on the plaintiff's allegation that he became short of breath when exerting himself.

What the plaintiff seems to be missing in the ALJ's discussion is the fact that the plaintiff did not allege any shortness of breath at his hearing. Instead, as the ALJ summarized, he claimed he became dizzy when standing for just five minutes and became fatigued easily (R. 65), and he testified that he had been experiencing these symptoms since 2014 (R. 66) and had reported them to his doctors repeatedly. (R. 66-67). As the ALJ explained, that testimony was not true. (R. 31). Again, the plaintiff claimed that he became dizzy after just fifteen minutes of standing and which he claimed he had been dealing with for years. (R. 65-66). That allegation runs counter to the record, as already discussed, so the ALJ was surprised to hear about it even more surprised to hear that plaintiff told his doctors about it and wanted to double check:

13

Q: So you're saying all this started in 2014, nine years ago?

A: Correct.

Q: Okay, so when I look at your medical records, I should be looking for complaints of, hey, Doctor, I get tired easily. I'm having episodes of dizziness, especially if I walk very far or for very long. That's what you were telling your doctors for the last nine years, that you've had these ongoing problems?

A: I would say correct.

(R. 66). But, that was not correct. There is no record of plaintiff telling his doctor of any such complaints for nine years or at any point before 2023.

Plaintiff's testimony was equivocal on other points as well. For example, while the plaintiff admitted that he had been incarcerated for domestic violence, he had two versions about that. For the ALJ at his hearing, the sentence was a few months. (R. 58). For his doctors, it was two years. (R. 444, 637). Similarly, in March 2019, plaintiff told his doctor that he was "work[ing] here and there in construction." (R. 459). But, at his administrative hearing, the plaintiff testified that he had not worked at all since 2014. (R. 54). When the ALJ pointed out that the plaintiff told his doctor he was doing construction work in 2019, the plaintiff was forced to change his story, and said he was trying to do construction work for about a year, but quit because he couldn't get along with people. (R. 54-56).[3]

_____

[3] The plaintiff doesn't think the ALJ should have made an issue out of his sketchy testimony regarding his construction work because the ALJ did not know what the physical demands of the 2019 work were. [Dkt. #18, at 10]. The plaintiff misses the point. Whatever the demands might have been, the work was certainly not consistent with the plaintiff's claim that he has been getting dizzy after fifteen minutes of standing since 2014. Moreover, if the 2019 construction work was not very demanding physically, what better opportunity to explain how easy it was than in a brief filed in federal court? Leaving that opportunity hanging tends to raise the eyebrow of a reviewing court, especially when the plaintiff has sworn that he has not been employed at all since 2014. [Dkt. ##4, 8].

14

Certainly, a plaintiff's inconsistent statements can be said to undermine the credibility of the allegations.  *Grotts*, 27 F.4th at 1279; *Zoch*, 981 F.3d at 601.  Contrary to what plaintiff appears to be arguing, SSR 16-3p does not preclude an ALJ from considering inconsistent statements like these. In fact, and not surprisingly, it specifically calls for it, *see* SSR 16-3p, 2016 WL 1119029, *8 ("... we will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances."), as do the regulations. See 20 CFR §§ 404.1529(c)(4), 416.929(c)(4).

Perhaps due to a careless reading of the ALJ's opinion – or perhaps in desperation – the plaintiff asserts that, when pointing out the inconsistencies between what the plaintiff said at the hearing in order to get benefits and what he told his doctors in order to get medical treatment, the ALJ "focused on treatment records that pre-date [plaintiff's] cardiac complaints and symptoms which began in early 2023."  [Dkt. #18, at 14].  That is also not true.  The ALJ specifically noted that plaintiff didn't report he had been suffering any dizziness at cardiology exams on January 30, 2023, on February 27, 2023, or March 15, 2023.  (R. 31).

Finally, the plaintiff takes issue with the ALJ noting that he continued to smoke despite his complaints of shortness of breath and his doctors entreating him to stop.  As the plaintiff argues, the Seventh Circuit has said:

> that people continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop.  For this reason, a claimant's failure to quit smoking is an unreliable basis on which to rest a credibility determination.

*Martinez v. Kijakazi*, 71 F.4th 1076, 1082–83 (7th Cir. 2023).  But, here, the ALJ did not rest her credibility finding on the plaintiff's refusal to quit smoking.  As just detailed, the ALJ had much

more to go on.

And, given the record, we will not fault the ALJ for mentioning it. Plaintiff's doctor first provided a "plan for smoking cessation education" on September 28, 2021 (R. 739). Smoking cessation as advised on July 28, 2022. (R. 721). He was again advised to quit smoking on December 29, 2022. (R. 727). The plaintiff was encouraged to quit smoking and received counseling about tobacco use on January 25, 2023. (R. 730). On February 27, 2023, the plaintiff was again advised strongly to quit (R. 857, 868). He was advised strongly to stop on March 15, 2023. (R. 838). All through treatment, doctors repeatedly characterized the plaintiff as "unmotivated to quit": on January 30, 2023 (R. 756,757, 787, 789), February 1, 2023(R. 787, 788), February 2, 2023 (R. 770,774, 781, 784), February 8, 2023 (R. 749, 757, 760, 766), February 19, 2023 (R. 749), February 27, 2023(R. 856), and March 1, 2023. (R. 871, 873). Indeed, the plaintiff's refusal to quit smoking despite medical advice is such an integral part of the medical record that if the ALJ had *not* mentioned it, one would think she wasn't paying attention.

It is true, as the plaintiff submits, that the Seventh Circuit has explained that "[g]iven the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health" and that failure to quit is "an unreliable basis on which to rest a credibility determination." *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). But here, the drumbeat of doctors characterizing plaintiff as "unmotivated" to quit gives the impression, not so much of someone who is struggling against an addiction, but of someone who is ignoring medical advice.

Employing canned arguments and relying on well-worn formats for briefs is likely all but essential when a lawyer takes on a heavy caseload. But, they should be used appropriately; one can't

force square pegs into round holes. Here, from an objective perspective, the plaintiff's dicey testimony is the square peg and the well-worn SSR 16-3p argument is the round hole. Given the record and plaintiff's testimony, the court cannot find that the ALJ's evaluation of the plaintiff's allegations was "patently wrong;" far from it.

## III.

But, just because there is "substantial evidence" to support the ALJ finding that the plaintiff exaggerated his limitations does not mean there is "substantial evidence" to support the ALJ's conclusion that the plaintiff could perform medium work, or that the ALJ adequately explained her path from the medical evidence to her conclusion. As already stated, the ALJ's reasoning was clearly fine as far as 2023 and plaintiff's condition in 2023 is really what this case is about. Plaintiff cites no medical evidence from prior to that year and, as already discussed, the medical evidence from before 2023 fails to establish any disability. Plaintiff concedes that his cardiac impairment did not develop until 2023 [Dkt. #18, at 10], and that his "cardiac complaints and symptoms . . . began in early 2023." [Dkt. #18, at 14].

The first of the 2023 studies was a CT lung screening on January 9th which revealed one 5 mm noncalcified pulmonary nodule in the right lower lung superior segment. Under 20mm, this was deemed a category two, considered to be benign, and yearly followup was recommended. (R. 735). However, severe coronary arterial calcifications were noted, as well as an ascending thoracic aortic aneurysm. (R. 735). At a followup exam on January 25, 2023, plaintiff denied suffering any shortness or other respiratory issues. He denied any cardiac issues: no difficulty breathing when lying down, no chest pain, no dyspnea on exertion denies, no syncope. (R. 730). Physical exam was normal. Lungs were clear, respiration was easy and unlabored, although lung sounds were

diminished to auscultation bilaterally. Heart rate was regular and normal. (R. 731).

On February 2, 2023, plaintiff underwent an echocardiogram. Left ventricle cavity size was normal, wall thickness was normal, systolic function is normal, estimated ejection fraction was within normal range at 55-60.[4] Wall motion was normal and there were no regional wall motion abnormalities. There was mild regurgitation in the mitral valve. Right ventricular systolic pressure was in the normal range, and the was no significant pericardial effusion. (R. 773).

On February 8, 2023, because the plaintiff complained of fatigue on the treadmill, the study was switched to a Lexiscan stress test. There was no evidence of myocardial ischemia, ejection fraction was normal, EKG study was normal, but the study findings suggested moderate fixed coronary artery disease, predominantly involving the right coronary artery. (R. 758-59). On February 10th, a CT chest scan ruled out aneurysmal thoracic aorta. There was mild calcified aortic atherosclerotic plaque and calcified coronary artery atherosclerosis, but no significant pericardial effusion. There was mild emphysema, but no significant pleural effusion. (R. 748-49).

Due to coronary calcification and moderate fixed coronary artery disease, as well as risk factors for coronary artery disease, plaintiff's cardiologist recommended a cardiac catheterization with possible angioplasty and stent. (R. 857). On March 7th, that procedure revealed nonobstructive coronary artery disease, at most a 40% mid-left anterior descending artery and 40% OM #2 stenosis (R. 847). Treatment plan was medication. (R. 847). At followup on March 15, 2023, plaintiff reported that he was feeling fine; no chest pain or shortness of breath. (R. 838). Physical exam was normal: respiration rate was normal, lungs were clear to auscultation, heart sounds and rhythm were

---

[4]https://www.mayoclinic.org/tests-procedures/ekg/expert-answers/ejection-fraction/faq-2005828 6#:~:text=According%20to%20the%20American%20Heart,is%20usually%2040%25%20or%20less.

normal, femoral and peripheral pulses were normal, there was no peripheral edema. (R. 840).

So, there are some concerning objective findings, some not-so-concerning objective findings, and some normal objective findings. The evidence does not lead inexorably to the conclusion that plaintiff is disabled, but neither does it lead inexorably to the conclusion that the plaintiff can perform medium work. Medium work is, after all, rather strenuous. It requires lifting up to fifty pounds and carrying twenty-five pounds frequently – one-third to two-thirds of every day – and standing or walking, off and on, for a total of approximately six hours in an eight-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to twenty-five pounds. *Jarnutowski*, 48 F.4th at 772; SSR 83-10, 1983 WL 31251, *6. So, essentially, one is expected to carry a case of beer or a toddler around for up to six hours a day. *See Colleen G. v. Kijakazi*, No. 23 C 0357, 2024 WL 216666, at *5-6 (N.D. Ill. Jan. 19, 2024). Can someone with a 40% occlusion of the anterior descending artery and moderate fixed coronary artery disease of the right coronary artery do that five days a week, week after week? "Possibly. But we cannot reach that conclusion from the ALJ's analysis. The ALJ did not explain how [the plaintiff] could lift and carry up to 50 pounds and frequently lift or carry objects weighing up to 25 pounds." *Jarnutowski*, 48 F.4th at 774–75.

While much of the ALJ's analysis was unassailable, when she got to 2023, she did what is prohibited and "played doctor" a bit. She interpreted some pieces of raw medical data without any commentary from a physician. The last time any doctor looked at the medical record was early 2022, well before the handful of cardiac studies were done. The ALJ acknowledged that (R. 32) and, surely, the studies done in early 2023 were of the kind that "changed the picture" sufficiently that the ALJ ought to have had a set of medically trained eyes take a look at them. *See, e.g., Moreno v.*

*Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). The Seventh Circuit has warned ALJs against interpreting MRIs on their own. *See, e.g., McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014); *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). Surely, the same goes for cardiac studies, especially if the results do not fall into the "mild," "minor," or "minimal" category. See *Baptist*, 74 F.4th at 443; *Israel v. Colvin*, 840 F.3d 432, 439–440 (7th Cir. 2016).

Again, most of the ALJ's opinion is logical, common-sensical, and supported by substantial evidence. The only portion where the court cannot trace the path of her reasoning is when she gets to the cardiac studies from early 2023. It is not obvious that someone with the results the plaintiff had on those tests could perform medium work. That is where a medical opinion ought to have come in.

## CONCLUSION

For the foregoing reasons, the plaintiff's social security motion [Dkt. #18] is granted in part and denied in part, the defendant's motion for summary judgment [Dkt. #19] is granted in part and denied in part; and the ALJ's opinion is remanded for the limited purpose of addressing the plaintiff's condition as of 2023 and for the ALJ to consult a medical expert regarding the 2023 cardiac studies.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 10/28/24

20